IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs January 21, 2021

**STATE OF TENNESSEE v. ALONZO HOSKINS**

**Appeal from the Criminal Court for Knox County**
**No. 111103   Bobby R. McGee, Judge**

_____

**No. E2020-00052-CCA-R3-CD**

_____

A Knox County jury convicted the Defendant, Alonzo Hoskins, of six counts of felony murder of the victim, based upon six underlying felonies, and one count of especially aggravated robbery. The trial court merged the Defendant's convictions for felony murder and imposed a life sentence plus twenty years for especially aggravated robbery. On appeal, the Defendant asserts that: (1) all counts of the presentment failed to allege an offense; (2) the trial court erred when it denied his motion to suppress the cell phone records; (3) the trial court erred by preventing defense counsel from making an inquiry or proper record into the competency of a juror; (4) the prosecutor's closing argument was improper; and (5) the evidence was insufficient to support his convictions. After a thorough review of the record and applicable law, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ROBERT H. MONTGOMERY, JR., JJ., joined.

Keith Lowe, Knoxville, Tennessee, for the appellant, Alonzo Hoskins.

Herbert H. Slatery III, Attorney General and Reporter; Cody N. Brandon, Assistant Attorney General; Charme P. Allen, District Attorney General; and Ta Kisha Fitzgerald, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
**I. Facts**

This case arises from the May 30, 2017 shooting death of the victim, Jack McFall. For his role in the victim's death, a Knox County grand jury indicted the Defendant for felony murder in the perpetration of an attempted robbery (count one), felony murder in the perpetration of a robbery (count two), felony murder in the perpetration of an attempted

burglary (count three), felony murder in the perpetration of a burglary (count four), felony murder in the perpetration of an attempted theft (count five), felony murder in the perpetration of a theft (count six), and especially aggravated robbery (count seven).

## A. Suppression Hearing

The Defendant filed a motion to suppress the cell phone records involved in this case because the trial court lacked authority to issue the search warrant. At the hearing on the motion, the Defendant testified that the cell phone number he owned at the time of this killing ended in -0769. The State and the Defendant stipulated that the Defendant had a cell phone in his possession at the time of his arrest. The Defendant argued that the trial judge who signed the search warrant lacked authority to issue a warrant for property located outside of his jurisdiction because the business address of AT&T, listed on the search warrant, was in North Palm Beach, Florida, rather than in Tennessee. The Defendant further argued that the search warrant did not establish a nexus between the cell phone data and the crime.

The State argued that the affidavit of Lieutenant Heather Reyda was sufficient to establish a nexus between the cell phone data and the crime. The State further contended that the search warrant was sent to the AT&T office in North Palm Beach, Florida (the address listed on the search warrant) because AT&T preferred to receive all subpoenas and search warrants in one centralized location. The State noted that AT&T conducted business and maintained data through its office in Knox County, Tennessee.

After hearing the arguments of the parties, the trial court denied the Defendant's motion to suppress. It found that although the search warrant was issued in Knox County for cell phone records stored digitally in Florida, the Knox County judge was not compelling disclosure in Florida. The trial court further found:

> It is simply the way the business has asked for the matter - - for this process to occur, wherein a [S]tate of Tennessee search warrant can be honored even though they digital - - digitally stored materials may be in a different state. At any rate, I don't see that this is a search conducted in violation of the service provider's rights or the [D]efendant's rights.

## B. Trial

At the Defendant's trial, the parties presented the following evidence: the victim's wife, Sandra McFall, testified that the victim's cell phone number at the time of his death ended in -7367. Ms. McFall testified that she first saw the Defendant, whom she knew as "T," in January or February 2017, as he was walking around in her yard having a conversation with the victim. She said that the two were accompanied by another, darker complected, African-American man. Ms. McFall testified that the Defendant wore his hair

in "corn rows," and the other man had a "small afro" hairstyle. Ms. McFall testified that the victim walked with a cane due to a stroke that affected the left side of his body.

Ms. McFall said that she saw the Defendant a second time in April 2017 when he knocked on the door of her residence and asked for the victim. She said that the victim allowed the Defendant into the residence, but she did not hear their conversation. Ms. McFall testified that she returned from vacation on May 22, 2017, to accompany the victim to a doctor's appointment scheduled for the following day. She noted that the victim was upset when she arrived home about some pain pills that he had purchased from the Defendant. Ms. McFall explained that the victim purchased the pills from the Defendant to resell. She said that the victim called the Defendant many times, and he became irate that the Defendant did not answer the phone. She identified the receipt from Rocky Hill Family Physicians as the payment that the victim made for the May 23 appointment. Ms. McFall testified that at some point after 4:15 p.m. on May 30, 2017, the victim left home after receiving a communication from "someone."

On cross-examination, Ms. McFall admitted that she did not approve of the victim selling pain pills, and she attempted to separate herself from his activities. She did not think that any threats were exchanged between the victim and the Defendant.

On redirect examination, Ms. McFall read into evidence several text messages from the victim's cell phone records. She identified an exchange, occurring on May 24, 2017, between the victim's cell phone number and "T's new number," meaning the Defendant's cell phone number which ended in -0769. On that day, the Defendant texted the victim: "Call me, Jack. It's important. This is T." One minute later, the Defendant texted the victim: "It's about business. I need to make sure everything was straight the last visit. I just got a call from somebody and they tell me something wasn't right with that order." The victim then replied: "You gave me 105 instead of 110 and 35 of them are fake."

Three days later, on May 27, 2017, the Defendant texted the victim: "What's up, Jack." The victim replied: "When are you going to be coming in?" The Defendant replied: "Monday. How many you want me to bring you?" The victim texted the Defendant: "The 40 you owe me, plus 60." On May 30, 2017, the victim sent a text message to the Defendant asking: "What happened to Monday?" A short time later, the victim received a text message from a cell phone number ending in -0853, which was entered into the victim's phone as also belonging to "T." The message read: "What's up, Jack?" To which the victim replied: "Who is this?" The Defendant texted: "T." The Defendant next asked: "You ready?" At 4:39 p.m. the victim replied: "Sure." Ms. McFall noted that the victim then left the house soon after. The Defendant next texted the victim: "I'm not driving. I took the bus again. Can you meet me at the room you took me to that one time you picked me up?" The victim replied: "I can't remember the room number." The Defendant and the victim exchanged several more texts, and the Defendant said: "The same room you took me to at the Red Roof Inn, Strawberry Plains." The Defendant then texted: "It's 109

total." To which the victim replied: "I'm on my way." The Defendant texted: "Okay call me when you're outside[]" and "$4,140."

Lieutenant Heather Reyda of the Knox County Sheriff's Office, Major Crimes Unit, testified that on May 30, 2017, she received a call informing her that the victim had been shot in the parking lot of the Red Roof Inn located near the Strawberry Plains Pike Exit on Interstate 40. Lieutenant Reyda responded to the scene as the lead investigator and saw that the victim was in his van still buckled in by the seat belt. The responding officers informed her that the shooting had been captured on the hotel's video surveillance camera. She reviewed the surveillance video and saw what appeared to be one, darker complected, black male and one lighter-complected black or Hispanic male ("the shooter"). From reviewing the video, Lieutenant Reyda said that the shooter stepped out of the back of the victim's van, raised a weapon, and fired. In the video, another man, who wore a red shirt, appeared unarmed but carried what appeared to be a white envelope. Lieutenant Reyda also saw what appeared to be a light blue car with a black convertible top, possibly a Chrysler Sebring, in the video.

Lieutenant Reyda testified that she obtained the victim's cell phone and looked at the last phone numbers to communicate with him, opining that the victim's last contacts would be the suspects in his murder. Lieutenant Reyda testified that with the assistance of the Federal Bureau of Investigation ("FBI"), she began "pinging" the cell phone numbers associated with the victim's phone. She said that still photographs were immediately taken from the surveillance video and released to the media. This led to a tip from a caller, who identified himself as Tim Wells, for a possible suspect, and Lieutenant Reyda interviewed Mr. Wells. He showed her a cell phone number entered into his phone ending in -0769, which was one of the numbers that they were pinging. Mr. Wells had the contact information for the phone number listed as belonging to "Alonzo Smith." He also reported seeing the Defendant on McCalla Avenue. Lieutenant Reyda testified that the victim's van was processed for evidence, and the Defendant's fingerprint was found inside the van.

Lieutenant Reyda testified that as a result of pinging the Defendant's phone, the Defendant was located in Detroit, Michigan, and taken into custody on June 2, 2017. She and her partner flew to Detroit and collected evidence, and they attempted to interview the Defendant. Lieutenant Reyda testified that two men, Corey Crawford and Eric Fields, were in the car with the Defendant at the time of his arrest. Further investigation proved that Mr. Crawford's fingerprints were found in an apartment that the Defendant had previously rented located on McCalla Avenue in Knoxville. Lieutenant Reyda testified that, while Mr. Crawford and Mr. Fields both matched the overall description of the man carrying the envelope in the surveillance video, she was unable to positively identify the second man, who wore the red shirt, in the video. Lieutenant Reyda identified a Chrysler key, which operated a van found in Detroit, taken from the Defendant at the time of his arrest. She was unable to locate the keys to the victim's van.

- 4 -

Lieutenant Reyda testified that she obtained consent from the homeowner at the Defendant's residence in Detroit to collect some items from the house. Those items included a pair of camouflage shorts and a pair of black and white "retro" Air Jordan tennis shoes. Lieutenant Reyda testified that the shorts and shoes resembled those worn by the shooter in the surveillance video. A receipt for a pair of Air Jordan tennis shoes purchased in Knoxville was also found in the Defendant's Detroit residence. Lieutenant Reyda testified that she observed the Defendant's gait and hairstyle while they were in Detroit. She said: "He had a very distinct gait. It would appear that his one foot kind of went out really far and that he walked with a limp, which matched the walk of who I thought was the shooter in the video." Lieutenant Reyda testified that the Defendant's hairstyle appeared to be the same hairstyle of the shooter in the surveillance video. She noted that the Defendant had a "very distinct receding hairline."

Lieutenant Reyda testified that she had a "forensic dump" performed on the victim's phone. She then read the text messages between the victim and the Defendant into the record that had already been read into the record by Ms. McFall. Lieutenant Reyda testified that the victim had $140 in his shirt pocket at the time of his death. There was $1,000 in an envelope found under the victim's leg and $1,000 in an envelope on the floorboard of the victim's van. Lieutenant Reyda testified that she believed that the man in the video dressed in the red shirt had what appeared to be a white envelope in his hand. She noted that a total of $2,140 was recovered from the van, and if there were two other envelopes taken from the van with $1,000 each, there would have been a total of $4,140.00, the amount referenced in text messages between the victim and the Defendant.

Lieutenant Reyda testified that she also analyzed the Defendant's phone records for the phone numbers ending in -0769 and -0853. She said that the phones associated with the two numbers were located in Knoxville on May 30, 2017, but they were not in the State of Tennessee between May 23, 2017 and May 30, 2017. Lieutenant Reyda testified that the global positioning (GPS) coordinates from cell phone towers for the cell phones associated with the numbers ending in -0853 and -0769 showed that they were in the area of McCalla Avenue in Knoxville at approximately 1:00 p.m. on May 30, 2017, when Mr. Wells reported seeing the Defendant there. Based upon her investigation of the case, Lieutenant Reyda identified the Defendant as the shooter in the video.

On cross-examination, Lieutenant Reyda confirmed that the phone number ending in -0853 was the last number to contact the victim's phone, and the number for the phone in the Defendant's possession at the time of his arrest ended in -0769. She said that according to the victim's phone, the number ending in -0853 belonged to "T," which was the Defendant's "street name." She agreed that the number did not exist in the victim's phone until shortly before his death and after the victim texted, "Who is this?" Lieutenant Reyda admitted that she was unable to find any documentation that the Defendant owned the phone associated with number -0853, and she did not recover a phone associated with the number. She agreed that she had no personal knowledge as to who had access to the

phone. Through her investigation, Lieutenant Reyda believed that the phone belonged to and was used by the Defendant on May 30, 2017, in part because a text message to the victim from the -0853 number read, "This is T." She said that GPS coordinates also showed that the phones were together at similar times and places from Detroit to Knoxville and back to Detroit.

Lieutenant Reyda testified that the Defendant and the victim were both involved in buying and selling pain pills, and the victim was in contact with other individuals about buying and selling pills. She agreed that the Defendant appeared to be the victim's supplier of pills and that the Defendant brought them from Detroit to Knoxville. Lieutenant Reyda agreed that her department originally issued a "Be On the Lookout" ("BOLO") notice that indicated that one of the suspects in the victim's murder was white and the other was black.

On redirect-examination, Lieutenant Reyda testified that the phone associated with -0769 was turned off sometime before the victim's death. It was turned back on after his death on the Defendant's way back to Detroit. Lieutenant Reyda reiterated that the phones associated with the numbers ending in -0769 and -0853 were together after leaving Knoxville and while travelling back to Detroit.

Dr. Amy Hawes, a forensic pathologist employed by the Knox County Regional Forensic Center, performed an autopsy on the victim's body. She determined that the manner of the victim's death was homicide, and the cause of death was multiple gunshot wounds.

In May 2017, Dondre Penn was working for the Detroit Police Department and was assigned to the FBI task force. In June 2017, he was asked to assist the Knox County Sheriff's Office in locating the Defendant. Officer Penn testified that he located the Defendant at a gas station in the Detroit area by "pinging" the Defendant's cell phone. Officer Penn noted that he had been advised to look for the cell phone and tennis shoes in the Defendant's possession and that the Defendant might be driving a Chrysler Sebring. Officer Penn testified that the Defendant had the cell phone, associated with a cell phone number ending in -0769, in his possession when he was taken into custody.

Michael Allen Mays, the custodian of records for the Knox County Emergency Communications District, 911, testified that a call from Tim Wells came into the 911 center at 1:02 p.m. on May 30, 2017. The call was played for the jury, and Mr. Mays stated that Mr. Wells informed the operator that Alonzo Smith, whom he later identified as the Defendant, was present on McCalla Avenue in Knoxville. Mr. Wells described the Defendant as riding in a blue BMW accompanied by another man dressed in red. Mr. Mays testified that a second call came into the 911 center at 5:41 p.m. on May 30, 2017. The call came from the Red Roof Inn located on Crosswood Boulevard in Knoxville, Tennessee, and the caller reported hearing gunshots. Mr. Mays testified that a BOLO was issued at 8:31 p.m. on that same date for a "[l]ate model Chrysler Sebring, two-door convertible,

light blue and silver/black convertible top, possibly West Virginia tags." The occupants of the car were described as one black male and one white male. Mr. Mays agreed that the description of the car did not match the description of the vehicle that the Defendant was allegedly seen in at the time of the first call.

Samir Patel testified that he was employed by the Red Roof Inn and Suites located on Crosswood Boulevard in Knoxville. He noted that the hotel had sixteen video surveillance cameras located both inside and outside of the hotel. Mr. Patel testified that on May 30, 2017, police notified him of a shooting. He arrived at the hotel and provided a copy of the surveillance video to police.

Mr. Patel identified a receipt for Room 122 at the Red Roof Inn dated December 11-14, 2016. The room was registered in the Defendant's name and listed his home address in Grosse Pointe, Michigan. Mr. Patel also identified a receipt for Room 123 at the hotel dated December 11-18, 2016. The room was registered in Justin Smith's name and listed his home address as a residence located on East Edgemont Avenue, Montgomery, Alabama.

On cross-examination, Mr. Patel testified that there were two males in the surveillance video wearing hoodies. He agreed that his testimony at the preliminary hearing was that he believed one of the individuals was black and the other was white but that he could not tell the race of the man with the lighter complexion from the surveillance video.

Tim Wells testified that prior to May 30, 2017, he knew the Defendant as Alonzo Smith rather than Alonzo Hoskins. Mr. Wells testified that he and his wife rented an apartment to the Defendant on McCalla Avenue in east Knoxville. The lease was dated January 2, 2017, in the name of Alonzo Smith. The Defendant's brother, Justin Smith, rented the apartment across the hall from the Defendant. Mr. Wells testified that, at some point, the Defendant abandoned the apartment and did not pay rent for a couple of months. Mr. Wells said that he saw the Defendant at the property at approximately 1:00 p.m. on May 30, 2017, in a blue sedan that Mr. Wells thought was a BMW, and he called 911. Later that day, Mr. Wells saw a story on the news about a shooting at an east Knoxville hotel. He then saw either a video or a still shot of the blue sedan that he saw earlier in the day, and he again called police. The car was later determined to be a blue Chrysler Sebring.

Mr. Wells testified that he knew the Defendant walked with a slight limp. He viewed the surveillance video from the Red Roof Inn and Suites and noted that the individual on the video appeared to walk with a limp similar to that of the Defendant. Mr. Wells testified that the individual on the video who exited the back of a van appeared to be the Defendant, agreeing that the individual had a hairstyle similar to the one Defendant wore on May 30, 2017. Mr. Wells noted that the Defendant usually had two cell phones on a lanyard around his neck, and he identified a photograph of the Defendant with two

- 7 -

cell phones on a lanyard around his neck. On cross-examination, Mr. Wells agreed that he had previously identified the Defendant's vehicle as a white Cadillac Eldorado. He said that someone else at the apartment told him that the car looked like a blue BMW.

On redirect examination, Mr. Wells testified that an unidentified man, dressed in red, that Mr. Wells had seen with the Defendant in the car appeared to be the same person in the video from the Red Roof Inn. Mr. Wells testified that there were three other cars at the apartment when he saw the Defendant: a white Cadillac, an old Oldsmobile, and what he believed to be a blue BMW. Mr. Wells did not see which vehicle the Defendant got into, so he attempted to describe all of the vehicles to the 911 operator. Mr. Wells testified that the image of the blue vehicle from the hotel, which was later determined to be a Chrysler Sebring, appeared to be similar to the vehicle that he saw at the apartment. Mr. Wells reiterated that he believed the man in the video from the hotel was the Defendant based on similarities between their walk, hairline, and skin color. His identification was further confirmed by the fact that, when he saw the Defendant that evening, he was accompanied by a man dressed in red and the two were in a blue car similar to the one seen in the video.

Philip Finara, an independent contractor who was the custodian of records for AT&T at the time of trial, explained that AT&T's information was stored in their network, and records were kept in the normal course of business. Mr. Finara testified that "once a subpoena [wa]s sent, information [wa]s pulled out and sent to the Court." Pursuant to a subpoena in this case, Mobility Usage Reports were prepared for two phone numbers ending in -7367 and -0769. The report for the number ending in -0769 also included "cell location." Mr. Finara explained that his records included the cell site identification of the cell phone tower the phone used, including the longitude and latitude of that particular tower.

Kenneth LeCesne, the records custodian for T-Mobile, Metro PCS Cellular Telephone Company, in Richland, Texas, testified that T-Mobile phone records were maintained electronically. Mr. LeCesne further testified that call detail records were actually phone logs that were kept at the time that calls were made or received by a T-Mobile or Metro PCS customer. He received a search warrant from the Knox County Sheriff's Office for phone records from May 30, 2017, for a phone number ending in -0853.

Shane Addington, the custodian of records for C&C Motor Company, testified that the Defendant entered into a contract with the company on January 5, 2017, for the purchase of a vehicle. Mr. Addington testified that the Defendant listed his phone number on the contract as ending in -0769.

Rebecca Davis testified that she was visiting the zoo in Knoxville on May 30, 2017, with her husband, John, and their children. They decided to stay overnight at the Red Roof

Inn and Suites. Mrs. Davis testified that, just before 6:00 p.m., she and her family were in the parking lot leaving for dinner when she heard at least two gunshots and saw two men running. One of them she described as a black male wearing a red sweatshirt and armed with a gun. She said that the other man was further away from her. Mrs. Davis testified that she and her family got into the car, and her husband drove away. A car suddenly drove up behind their vehicle and began tailgating them. Mrs. Davis testified that she was afraid that they had just witnessed something at the hotel and that "somebody was coming after [them]." Mrs. Davis testified that her husband pulled over, and the car passed them. She thought the car was light blue or some other light color with either a Michigan or West Virginia license plate. Mrs. Davis testified that her husband drove to a gas station, and she called 911 and the hotel to report what they had seen. Mrs. Davis testified that she and her family moved to a different hotel and later met with Lieutenant Reyda to give a statement.

On cross-examination, Mrs. Davis agreed that she told Lieutenant Reyda that she thought the second man she saw running appeared to be either white or Hispanic but that she did not get a good look at him.

Mrs. Davis's husband, John Davis, testified and confirmed Ms. Davis's account of the events surrounding the shooting. He said that, as he attempted to buckle his son into the car seat, he heard gunshots. He then saw an armed man run out from between two cars parked near them. He also remembered hearing voices but could not tell what they were saying. Mr. Davis saw other vehicles in the parking lot that were not there earlier. He thought that the voices came from the area of those vehicles. Mr. Davis testified that, after he and his family left the hotel, he remembered seeing a light-colored vehicle drive up behind them.

Sandi Campbell of the Knox County Sheriff's Department, Forensic Services Unit, went to the Red Roof Inn and Suites on May 30, 2017, to collect evidence and document the scene. Deputy Campbell testified that there were two envelopes in the victim's van each containing $1,000 in $100 bills. She saw a bullet hole in the interior driver's side door of the van, and officers found the projectile from a bullet inside the driver's side door panel. Deputy Campbell said that a .40-caliber cartridge casing was in the back driver's-side seat and that a second cartridge casing was in the front passenger seat. Deputy Campbell testified that a piece of paper was recovered from the scene that had a fingerprint lifted from it. A Cricket ZTE cell phone was collected from the victim's left shirt pocket. Deputy Campbell testified that the van's interior was processed for fingerprints, and some were obtained for further analysis. A bullet fragment was later recovered from the victim's abdomen during his autopsy. Deputy Campbell testified that she reviewed the surveillance video, which showed one of the suspects wiping down both the inside and outside of the van.

Nikki Hoskins, the office manager for Rocky Hill Family Physicians, who maintained the records for the practice, identified a credit card receipt from their online processing system for the victim dated May 23, 2017, at 9:46 a.m.

Tom Finch of the Knox County Sheriff's Office, Forensic Services Unit, testified as an expert in the field of identification of latent fingerprints. He processed several items in the present case for fingerprints, including the receipt from Rocky Hill Family Physicians. Mr. Finch determined that a fingerprint from the receipt came from the Defendant's left ring finger.

Based upon this evidence, the jury convicted the Defendant of felony murder in the perpetration of an attempted robbery, felony murder in the perpetration of a robbery, felony murder in the perpetration of an attempted burglary, felony murder in the perpetration of a burglary, felony murder in the perpetration of an attempted theft, felony murder in the perpetration of a theft, and especially aggravated robbery. The trial court merged the Defendant's convictions for felony murder and imposed a life sentence plus twenty years for especially aggravated robbery.

## I. Analysis

On appeal, the Defendant asserts that: (1) all counts of the presentment failed to allege an offense; (2) the trial court erred when it denied his motion to suppress the cell phone records; (3) the trial court erred by preventing defense counsel from making an inquiry or proper record into the competency of a juror; (4) the prosecutor's closing argument was improper; and (5) the evidence was insufficient to support his convictions.

### A. Sufficiency of the Presentment

The Defendant asserts that each count of the presentment failed to provide notice of the "acts he was charged to defend and fail[ed] to protect him from double jeopardy." More specifically, he complains that the presentment failed to allege the specific property taken from the victim in counts one, two, five, six, and seven, and that it failed to allege the specific theory of burglary in counts three and four. The State responds that the Defendant has waived his argument with respect to counts one through six of the presentment because he failed to include arguments as to those counts in his motion for new trial, and that despite the waiver, all seven counts of the presentment were "sound."

We agree with the State that the Defendant has waived this issue as to counts one through six of the presentment because he only challenged count seven in the motion for new trial as being void. Tenn. R. App. P. 3(e). While the Defendant did assert in his motion for new trial that the trial court erred by denying his motion for a bill of particulars, he does not raise the issue in his brief on appeal.

Even if the Defendant did not waive his argument with respect to counts one through six, all seven counts of the presentment were sufficient to inform the Defendant of the nature of the charges against him. Challenges to the validity of an indictment or presentment present questions of law and, thus, are reviewed *de novo*. *State v. Hill*, 954 S.W.2d 725, 727 (Tenn. 1997). Pursuant to the provisions of both the Tennessee and United States Constitutions criminal defendants have a right to know "the nature and cause of the accusation." U.S. Const. amend. VI; Tenn. Const. art. I, § 9. "As Tennessee courts have held, in order to satisfy the constitutional requirement, an indictment or presentment must provide a defendant with notice of the offense charged, provide the court with an adequate ground upon which a proper judgment may be entered, and provide the defendant with protection against double jeopardy." *State v. Byrd,* 820 S.W.2d 739, 741 (Tenn.1991); *see also State v. Duncan*, 505 S.W.3d 480, 484 (Tenn. 2016). A "valid indictment is an essential jurisdictional element, without which there can be no prosecution." *Dykes v. Compton,* 978 S.W.2d 528, 529 (Tenn.1998). Tennessee Code Annotated section 40-13-202 (2018) states:

> The indictment must state the facts constituting the offense in ordinary and concise language, without prolixity or repetition, in such a manner as to enable a person of common understanding to know what is intended, and with that degree of certainty which will enable the court, on conviction, to pronounce the proper judgment . . . .

Indictments or presentments are reviewed from an "enlightened standpoint of common sense and right reason rather than from the narrow standpoint of petty preciosity, pettifogging, technicality or hair splitting fault finding." *Hill*, 954 S.W.2d at 728 (quoting *United States v. Purvis*, 580 F.2d 853, 857 (5th Cir. 1978)). In a number of cases since *Hill*, this court has held that an indictment meets statutory and constitutional requirements if it "achieve[s] the overriding purpose of [providing] notice to the accused," noting the Court's "relaxation of common law pleading requirements and its reluctance to elevate form over substance." *State v. Hammonds*, 30 S.W.3d 294, 300 (Tenn. 2000); *see also State v. Sledge*, 15 S.W.3d 93, 95 (Tenn. 2000); *Crittenden v. State*, 978 S.W.2d 929, 931 (Tenn. 1998); *Ruff v. State*, 978 S.W.2d 95, 99 (Tenn. 1998). "It is generally sufficient for the indictment to state the offense charged in the words of the statute." *State v. Majors*, 318 S.W.3d 850, 864 (Tenn. 2010); *see Sledge*, 15 S.W.3d at 95. Additionally, "theories available to support a conviction of [an] offense [are] not required to be included in the indictment." *State v. Lemacks*, 996 S.W.2d 166, 172 (Tenn. 1999); T.C.A. § 40-13-206(a).

As to the seven counts in this case, the presentment alleges:

> The Grand Jurors for the State of Tennessee upon their oaths, present that ALONZO HOSKINS, ALIAS, heretofore, to-wit: On or about the 30th day of May, 2017, in the State and County aforesaid, did unlawfully kill Jack McFall during the attempt to perpetrate Robbery, in violation of

T.C.A. 39-13-202, and against the peace and dignity of the State of Tennessee.

SECOND COUNT

And the Grand Jurors aforesaid, upon their oaths aforesaid, do further present that ALONZO HOSKINS, ALIAS, heretofore, to-wit: On or about the 30th day of May, 2017, in the State and County aforesaid, did unlawfully kill Jack McFall during the perpetration of Robbery, in violation of T.C.A. 39-13-202, and against the peace and dignity of the State of Tennessee.

THIRD COUNT:

And the Grand Jurors aforesaid, upon their oaths aforesaid, do further present that ALONZO HOSKINS, ALIAS, heretofore, to-wit: On or about the 30th day of May, 2017, in the State and County aforesaid, did unlawfully kill Jack McFall during the attempt to perpetrate Burglary, in violation of T.C.A. 39-13-202, and against the peace and dignity of the State of Tennessee.

FOURTH COUNT:

And the Grand Jurors aforesaid, upon their oaths aforesaid, do further present that ALONZO HOSKINS, ALIAS, heretofore, to-wit: On or about the 30th day of May, 2017, in the State and County aforesaid, did unlawfully kill Jack McFall during the perpetration of Burglary, in violation of T.C.A. 39-13-202, and against the peace and dignity of the State of Tennessee.

FIFTH COUNT:

And the Grand Jurors aforesaid, upon their oaths aforesaid, do further present that ALONZO HOSKINS, ALIAS, heretofore, to-wit: On or about the 30th day of May, 2017, in the State and County aforesaid, did unlawfully kill Jack McFall during the attempt to perpetrate Theft, in violation of T.C.A. 39-13-202, and against the peace and dignity of the State of Tennessee.

SIXTH COUNT:

And the Grand Jurors aforesaid, upon their oaths aforesaid, do further present that ALONZO HOSKINS, ALIAS, heretofore, to-wit: On or

about the 30th day of May, 2017, in the State and County aforesaid, did unlawfully kill Jack McFall during the perpetration of Theft, in violation of T.C.A. 39-13-202, and against the peace and dignity of the State of Tennessee.

SEVENTH COUNT:

And the Grand Jurors aforesaid, upon their oaths aforesaid, do further present that ALONZO HOSKINS, ALIAS, heretofore, to-wit: On or about the 30th day of May, 2017, in the State and County aforesaid, did unlawfully, knowingly by violence, take from the person of Jack McFall, Property, where Jack McFall suffered serious bodily injury, said taking accomplished with a deadly weapon, in violation of T.C.A. 39-13-403, and against the peach and dignity of the State of Tennessee.

The presentment was sufficient because it provided the Defendant with notice of the charged offenses, gave the trial court jurisdiction over the case, and protected the Defendant from double jeopardy. This court has previously held that a felony murder indictment or presentment must allege that the murder was committed during the perpetration of, or the attempt to perpetrate, a felony but need not include specific allegations of the elements and facts of the underlying felony. *See State v. Alfonzo E. Anderson,* No. W2000-00737-CCA-R3-CO, 2002 WL 1558491, at *2 (Tenn. Crim. App., at Jackson, Jan. 9, 2002) ("specific allegations of the elements and facts of the underlying felony are unnecessary"); *Alan D. Lawhorne v. State,* No. 273, 1990 WL 70908, at *2 (Tenn. Crim. App., at Knoxville, May 31, 1990) ("We do not think an allegation of the underlying felony was necessary to the validity of the indictment"). Moreover, it is not necessary for an indictment or presentment to allege what was taken during a robbery, burglary, or theft. *Majors*, 318 S.W.3d at 864 (the indictment was valid despite the failure to identify the "thing" with which the defendant tampered); *State v. Guy L. Hines*, No. E2012-02456-CCA-R3-CD, 2013 WL 5940634, at *5 (Tenn. Crim. App., at Knoxville, Nov. 5, 2013) ("while proof pertaining to [the elements of theft] is essential in order to sustain a robbery conviction, the law is clear that the constitutional requirements necessary to sustain an indictment are less exacting"); *see also State v. Haynes,* 720 S.W.2d 76, 83 (Tenn. Crim. App. 1986) (an indictment for burglary "must set forth and define the felony intended to be committed" but it is "not necessary to set forth exactly what the burglar intended to steal"). Finally, as pointed out by the State, a citation to the especially aggravated robbery statute alone in count seven would have provided sufficient notice to the Defendant of the charge against him. *Charles A. Guess v. Phillips*, No. W2019-01347-CCA-R3-HC, 2020 WL 1875233, at *2 (Tenn. Crim. App., at Jackson, Apr. 15, 2020), *perm. app. denied* (Tenn. Aug. 11, 2020). The Defendant is not entitled to relief on this issue.

**B. Denial of Motion to Suppress**

The Defendant contends that trial court erred in denying his motion to suppress cell phone records related to his cell phone number ending in -0769. Citing *State v. Frazier*, 558 S.W.3d 145, 149 (Tenn. 2018), the Defendant argues that the warrant was void because the trial court lacked jurisdiction to direct the service of the search warrant on AT&T in North Palm Beach, Florida, for electronic records stored there. The Defendant further contends that the warrant lacked a nexus between the records searched and the crime being investigated.

The State responds that the trial court did not err by determining that the search warrant was valid on its face. The State asserts that delivery of the warrant to a service address in Florida simply complied with AT&T's request to receive all warrants and subpoenas in one location to facilitate its response. The State further argues that unlike *Frazier*, where the "service address and the place to be searched were identical and beyond the issuing court's jurisdiction," the address on the search warrant in this case was not necessarily the place to be searched because the electronic records could have been accessed in Knox County. We agree with the State.

Our standard of review for a trial court's findings of fact and conclusions of law on a motion to suppress evidence is set forth in *State v. Odom*, 928 S.W.2d 18 (Tenn. 1996). Under this standard, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." *Id.* at 23. As is customary, "the prevailing party in the trial court is afforded the 'strongest legitimate view of the evidence and all reasonable and legitimate inferences that may be drawn from that evidence.'" *State v. Carter*, 16 S.W.3d 762, 765 (Tenn. 2000) (quoting *State v. Keith*, 978 S.W.2d 861, 864 (Tenn. 1998)). Nevertheless, this Court reviews *de novo* the trial court's application of the law to the facts, without according any presumption of correctness to those conclusions. *See State v. Walton*, 41 S.W.3d 75, 81 (Tenn. 2001); *State v. Crutcher*, 989 S.W.2d 295, 299 (Tenn. 1999). The trial court, as the trier of fact, is able to assess the credibility of the witnesses, determine the weight and value to be afforded the evidence, and resolve any conflicts in the evidence. *Odom*, 928 S.W.2d at 23. In reviewing a trial court's ruling on a motion to suppress, an appellate court may consider the evidence presented both at the suppression hearing and at the subsequent trial. *State v. Henning*, 975 S.W.2d 290, 299 (Tenn. 1998).

The Fourth Amendment to the United States Constitution requires a search warrant to contain a particular description of the items to be seized. *See Henning*, 975 S.W.2d at 296; *see also* U.S. Const. amend. IV. Furthermore, Article I, section 7 of the Tennessee Constitution prohibits general warrants, and Tennessee Code Annotated section 40-6-103 requires search warrants to describe particularly the place and property to be searched. *State v. Bostic*, 898 S.W.2d 242, 245 (Tenn. Crim. App. 1994); *see also* Tenn. Const. art. I, § 7; T.C.A. § 40-6-103 (2018). To satisfy the particular description requirement, a

warrant "'must enable the searcher to reasonably ascertain and identify the things which are authorized to be seized.'" *State v. Meeks*, 867 S.W.2d 361, 372 (Tenn. Crim. App. 1993) (quoting *United States v. Cook*, 657 F.2d 730, 733 (5th Cir.1981)); *see also Henning*, 975 S.W.2d at 296.

> "Where the purpose of the search is to find specific property, [the property] should be so particularly described as to preclude the possibility of seizing any other [property]. . . . [I]f the purpose [of the warrant is to seize] . . . any property of a specified character which, by reason of its character, and of the place where and the circumstances under which it may be found, if found at all, would be illicit, a description, save as to such character, place and circumstances, would be unnecessary, and ordinarily impossible."

*Lea v. State*, 181 S.W.2d 351, 352-53 (Tenn. 1944); *see also Henning*, 975 S.W.2d at 296. For purposes of the Fourth Amendment, the search and seizure of places and things implicate an individual's reasonable expectation of privacy, while the seizure of property occurs when there is "some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 446 U.S. 109, 113 (1984).

In this case, the search warrant for the Defendant's cell phone records for the number ending in -0769 was sent to AT&T's online service address for its "National Court Order Compliance Section," located in North Palm Beach, Florida.[1] The search warrant contained the following language concerning the records to be searched:

> Proof by "Affidavit in support of search warrant," which is specifically incorporated by reference herein, having been made this day before me that there is certain property, to wit: certain records of the above "Cellular service provider" located at the "Cellular Service Provider Online Service Address" all of which are accessed in the County of Knox, State of Tennessee where there is probable cause to believe that the "Cellular Service Provider" has in their possession or under their control said records. Moreover, as set forth, there is probable cause to believe that these records constitute evidence or tend to demonstrate that said customer/subscriber participated in or holds evidence to the commission of said violation.
>
> ***YOU ARE THEREFORE COMMANDED*** to make a forthwith search of records of the "Cellular Service Provider" located at the "Cellular Service

---

[1] The State also obtained the same cell phone records pursuant to a subpoena duces tecum sent to the address for AT&T in North Palm Beach, Florida, and a representative from ATT&T testified at trial concerning the records. The Defendant filed a motion to quash the subpoena but the motion was abandoned after the trial court denied the Defendant's motion to suppress.

Provider Online Service Address" for the "Subscriber/Customer Phone Number" during the "Target Time Period." These records are identified more specifically as: account holder name; address; local and long distance telephone connection records; records of session times and durations; length of service (including start date) and types of service utilized; telephone or instrument number or other subscriber number or identity of both incoming calls; and means and source of payment for such service; *AND INCLUDING* incoming and outgoing text message records including specific and actual text content, Internet communication records including specific and actual internet communication content, *AND* cellular site relay information including tower usage and meter strength of calls made on said telephone and/or Global Positioning System coordinates for the dates listed above all evidencing a criminal violation by said subscriber and if you find such property or any part thereof to bring it before the Court *ALONG WITH AN ACCOMPANYING AFFIDAVIT ATTESTING TO THE AUTHENCITY OF SUCH RECORDS* without unnecessary delay.

The trial court made the following findings at the suppression hearing concerning the search warrant:

[I]t would appear that search warrant was issued here in Knox County, Tennessee, and the records were apparently lodged or were stored, or whatever, in North Palm Beach, Florida. And I'm aware that a Trial Court's jurisdiction to compel anyone to turn over material or to comply with a search warrant is limited to the geographic limitations of the State of Tennessee.

However, what appears to be happening here is that these are - - these communication providing businesses to do business here in - - in Knox County, Tennessee, are in Tennessee and their presence is nationwide, maybe global, I don't know. And what they have in one place, they have in all of their places. It's not like we're talking about specific pieces of paper that can only be in one place or another. This is digital information, which can be accessed from many different places.

So my interpretation of what happened is that the Court - -the Knox County Judge issued an order to this business for them to turn over certain records. And the company - -rather than challenge the Court's authority, the company is simply asking for the State to facilitate this process by faxing the warrant to another state, after which they comply and send the records to the - - to the state.

- 16 -

So I don't - - it would not appear that a Tennessee Judge is actually compelling disclosure in Florida. It is simply the way the business has asked for the matter - - for this process to occur, wherein a [S]tate of Tennessee search warrant can be honored even though they digital - - digitally stored materials may be in a different state. At any rate, I don't see that this is a search conducted in violation of the service provider's rights or the defendant's rights. So the Court would deny the motion to suppress on that ground.

. . . .

Now, with regard to the nexus. It would appear that there was information on the victim's phone that the police looked at. And, of course, there's - - that, in no way, impacts any Constitutional right of the defendant. They just - - they're looking at the victim's phone. And then seeing the victim's phone, they see that the victim made repeated calls to a number that turned out to be the defendant's phone. And from that, they, based on their experience as law enforcement officers, believe that these phone calls, happening in close temporal proximity close in time to the crime itself, is a lead, a lead which is based on a probability that there's some connection between the attempted communication with the - - with the defendant and the crime that, ultimately, the defendant had been charged with.

This Court would find that there is probable cause to believe that the fruits of the search would support a finding - - would support a conviction. So the Court will deny the motion to suppress based on the lack of nexus.

And I understand it was the victim calling the defendant and not the other way around, but it's still evidence of a connection between the two. And the court would find that does support the issuance of the warrant

The Stored Communications Act ("SCA") was enacted as part of the Electronic Communications Privacy Act of 1986, with the purpose of "protect[ing] the privacy of users of electronic communications by criminalizing the unauthorized access of the contents and transactional records of stored wire and electronic communications, while providing an avenue for law enforcement entities to compel a provider of electronic communication services to disclose the contents and records of electronic communications." *In re United States for an Order Pursuant to 18 USC,* 707 F.3d 283, 286-87 (4th Cir. 2013); 18 U.S.C. §§ 2701 et seq. Section 2703 (c) of the SCA provides:

(c)   Records concerning electronic communication or remote computing service –

> (1)   A governmental entity may require a provider of electronic communication service or remote computing service to disclose a record or other information pertaining to a subscriber to or customer of such service (not including the contents of communications) only when the governmental entity –

> (A)   obtains a warrant issued using the procedures described in the Federal Rules of Criminal Procedure (**or in the case of a State Court, issued using State warrant procedures**) . . . by a court of competent jurisdiction;

> (B)   obtains a court order for such disclosure under subsection (d) of this section;

> (C)   has the consent of subscriber or customer to such disclosure;

> (D)   submits a formal written request relevant to law enforcement investigation concerning telemarketing fraud for the name, address, and place of business of a subscriber or customer of such provider, which subscriber or customer is engaged in telemarketing (as such term is defined in section 2325 of this title); or

> (E)   seeks information under paragraph (2).

18 U.S.C. § 2703(c) (emphasis added). A court of competent jurisdiction is defined by Title 18 as, among other things, "a court of general criminal jurisdiction of a State authorized by the law of that State to issue search warrants." 18 U.S.C.A. § 2711. The SCA does not provide for suppression of the evidence as an available remedy and states that "[t]he remedies and sanctions described in this chapter are the only judicial remedies and sanctions for **nonconstitutional** violations of this chapter." 18 U.S.C. § 2708; *United States v. Guerrero*, 768 F.3d 351, 358 (5th Cir. 2014) (emphasis added). The SCA does not specifically address whether a state court may authorize a search warrant for stored

electronic communications in another state, and Tennessee law does not authorize such a procedure.[2]

The only case in Tennessee to address the issue of whether a trial court in Tennessee may direct service of a search warrant for cell phone records stored in another state is *Christopher Lee Blunkall v. State*, No. M2017-01038-CCA-R3-PC, 2019 WL 104136 (Tenn. Crim. App., at Nashville, Jan. 4, 2019), *perm. app. denied* (April 11, 2019). In that case, the petitioner argued that trial counsel was ineffective for failing to file a motion to suppress text message communications between himself and the victim because the circuit court judge had no jurisdiction or authority to issue a search warrant to Verizon for the records located outside of Tennessee. *Id.* A panel of this court agreed with the post-conviction court's findings that even if the cell phone records were initially suppressed, "'the State could have obtained the records by other, proper means by the time the jury trial was conducted.'" *Id.* at \*25. This court held that the Petitioner failed to show prejudice "even assuming, arguendo, that trial counsel had been deficient by not filing any motion to suppress the text message communications based upon deficiencies in the warrant. *Id.* The Petitioner further argued that the circuit court judge lacked jurisdiction to issue a subpoena to Verizon for the subscriber information to his cell phone. This court found that the Petitioner had not shown prejudice by establishing that there was a reasonable probability that a suppression motion would have been successful. This court noted that the Petitioner had not provided evidence at the post-conviction hearing that the subpoena was served to a person located outside of Tennessee or that Verizon's headquarters was located in New Jersey. *Id.* at \* 27. This court noted that any defect in the subpoena "if raised at the proper time, could have been cured by the State." *Id.* at \*28. In regard to the Petitioner's argument that because the trial court lacked jurisdiction to issue the subpoena, the information was obtained in violation of the SCA, this court observed that suppression was not a remedy for a violation of the SCA. *Id.* at \*28; *see Guerrero*, 768 F.3d at 358.

Under Tennessee law, a "search warrant" is defined as an "order in writing in the name of the state, signed by a magistrate, directed to the sheriff, any constable, or any peace officer . . . commanding the sheriff, constable[,] or peace officer to search for personal property, and bring it before the magistrate." T.C.A. § 40-6-101. "A search warrant can only be issued on probable cause, supported by affidavit, naming or describing the person, and particularly describing the property, and the place to be searched." T.C.A. § 40-6-103. "No law enforcement officer shall search, examine, extract or duplicate any cellular telephone data, even if incident to a lawful arrest, unless . . . [t]he officer has obtained a search warrant issued pursuant to this part or Rule 41 of the Tennessee Rules of Criminal Procedure[.]" T.C.A. § 40-6-110(b)(1). Additionally, "[n]o cellular telephone data that is

---

[2] HB1187/SB1592 amended Tennessee Code Annotated, Title 39 and Title 40, relative to criminal procedure to authorize law enforcement officers, district attorneys general, and the attorney general "to seek criminal process for the production of wire and electronic communications and transaction records pertaining to the communications" and "sets guidelines for the service of and compliance with the criminal process."

obtained in violation of this section may be used in any court of law or administrative board as evidence, nor may other evidence that is derived from the illegally obtained data be used as evidence in any such proceeding." *Id.* § 40-6-110(c). "A magistrate with jurisdiction in the county where the property sought is located may issue a search warrant[.]" Tenn. R. Crim. P. 41(a). Circuit court judges may function as magistrates for the purpose of issuing a search warrant. T.C.A. § 17-1-103(b) (2009).

In *Frazier*, which the Defendant relies on in support of his argument that the trial court did not have jurisdiction to issue the warrant in this case, a judge of the 23rd Judicial District of Tennessee issued search warrants for property located in the 19th Judicial District. Our supreme court held that "in the absence of interchange, designation, appointment, or other lawful means, a circuit court judge in Tennessee lacks jurisdiction to issue search warrants for property located outside the judge's statutorily assigned judicial district." *Frazier*, 558 S.W.3d at 146; *see also United States v. Master*, 614 F.3d 236, 241 (6th Cir. 2010) (general sessions judge in Franklin County, Tennessee, had no authority to authorize a warrant for the search of the defendant's property in Coffee County, Tennessee).[3]

In our view, this case is distinguishable from *Frazier*. In this case, we agree with the State's argument and the trial court's findings that the warrant is facially valid because the address listed on the search warrant was simply a service address and that the trial court had jurisdiction to issue the warrant because the electronic records could be accessed in Knox County, Tennessee. The affidavit seeking to establish probable cause for a search warrant must demonstrate a nexus between the criminal activity, the place to be searched, and the items to be seized. *State v. Smith*, 868 S.W.2d 561 (Tenn. 1993). We agree with the trial court that the affidavit provided a "substantial basis" for finding probable cause. The evidence of the victim's communication with the Defendant's phone number immediately before the murder established a nexus between those communications and the murder.

Additionally, we find that if any error occurred in admitting the Defendant's cell phone records at trial, the error was harmless beyond a reasonable doubt. Even without the phone records, the proof at trial of the Defendant's guilt was overwhelming. The victim's wife testified that the Defendant, whom she knew as "T," and the victim knew each other, and the victim bought pain pills from the Defendant. Text messages from the victim's phone, to which law enforcement officers had lawful access, showed that he and someone identifying themselves as "T" exchanged text messages immediately before the victim's murder, and the two agreed to meet at the Red Roof Inn in order for the victim to

---

[3]We note that our Legislature recently added a second sentence to Tennessee Code Annotated section 40-1-106, which stated: "The judges of chancery and circuit courts have statewide jurisdiction to issue search warrants pursuant to chapter 6, part 1 of this title in any district." *See* 2019 Pub. Acts, c. 486, § 14, eff. July 1, 2019.

purchase pain pills from the Defendant.  The Defendant listed his phone number ending in -0769 on a contract for the purchase of a vehicle at C&C Motor Company, and he had the cell phone number associated with -0769 in his possession at the time of his arrest.  Tim Wells identified the Defendant, whom he knew by another name, as being in Knoxville on the day of the murder and as the person in the surveillance video who shot the victim.  Lieutenant Reyda further identified the Defendant as the person seen in the surveillance video.  The Defendant's fingerprint was also found on a receipt in the victim's van.  A receipt from the Red Roof Inn showed that the Defendant had stayed at the motel in the past, and it listed the Defendant's address in Michigan.  Therefore, any error in the denial of the motion to suppress the cell phone records was harmless beyond a reasonable doubt.  The Defendant is not entitled to relief on this issue.

### C.  Volume Complaint by a Juror

The Defendant asserts that he was denied the right to a unanimous jury verdict because one of the jurors indicated that she was having trouble hearing the testimony.  He further argues that the trial court erred by preventing him from making an offer of proof concerning the issue.  The State responds that the issue is waived, and if not waived, the trial court appropriately responded to the juror's complaint.

After six witnesses had testified at trial, defense counsel notified the trial court of the following: "We're informed that, perhaps, juror number [nine] - - we were asked to speak up if juror number [nine]'s having difficulty hearing, which concerns me because this isn't an A misdemeanor shoplifting.  It's a first-degree murder case."  Defense counsel then suggested that the juror be brought in to determine how much of the trial she had not heard.  The following exchange occurred:

> THE COURT:    Well, there's a  - - there could be a lot of reasons to suspect that, for one reason or another, a juror has not fully - - been able to fully understand everything that's been said in the trial.  Sometimes the matters that we talk about lack a good bit of that jargon about the cell phones and the way they worked and what information they capture and all that sort of thing.  If you gave the jury a test to see how much of that they absorbed, it might be remarkably low.
>
> I don't think the Court's going to start engaging and going back to check upon the jurors and see if they adequately understood the testimony that's been given.  Both sides had a chance to voir dire everybody who's on the jury, ask them questions, make sure they could hear and understand the spoken language.  That's about the best we can do.
>
> Now, I'm going to begin asking the witnesses to speak up.  I'll ask counsel to speak up.  Everyone try to keep your voice up.  And we will try to make

sure we get the testimony to the jurors. But I think it's a very dangerous, slippery slope to start going backward in time and trying to check up on the jury to see - - to see if they have adequately absorbed the information that's been imparted from the stand.

I understand it's very serious, but there's no - -

[Defense Counsel]:        Well, Your Honor - -

THE COURT:        there's no procedure set forth in the Rules of Criminal Procedure about doing this kind of thing. And I don't want to - - I don't want to open Pandora's box here.

[Defense Counsel]:        Well, Your Honor, I just want to make a record here. This isn't my hunch or suspicion. Officer Miller came into the courtroom and said, juror number [nine] says, y'all need to speak up.

THE COURT:        I understand that.

[Defense Counsel]:        At which point I said, has she stated that she couldn't hear us? And Officer Miller indicated, yes, she stated she couldn't hear us.

THE COURT:        I understand.

[Defense Counsel]:        So this isn't an unsubstantiated suspicion on my part. I wouldn't ask you to bring a juror - -

THE COURT:        I understand that. I don't doubt for a minute that she and possibly other jurors have trouble hearing, and some may have trouble understanding everything, and some may have trouble understanding everything they do hear. And this is intrinsic in human life. All we can do is try to make sure we get the information loud enough for a person of ordinary ability to hear it.

I don't doubt for a minute that she and, perhaps, others have failed to hear some parts of the testimony. We had one - - we had one trial where one guy kept nodding off, just flat going to sleep.

[Defense Counsel]:        I would have moved for a mistrial. That's not a - - that's not an independent juror at that point.

THE COURT: I understand that. As you - - as you well know, there's nothing in the Rules of Criminal Procedure that tell the Court exactly what it should do.

[Defense Counsel]: I understand that. But, Your Honor, I have been in courtrooms, as have the General, no doubt, as have you, where there's been an allegation that somebody had contact with a juror and that juror's been brought in and been questioned. I know that's happened in Division I. I was in the courtroom when it happened, so . . . I do have to make a record here, Your Honor. I understand there's no rule for it, but - -

. . . .

THE COURT: - - if you're talking about a jury being - - what would you call it? - - poisoned by outside information relevant - - you know, having to do with the case, that's a different kind of matter. Jury tampering is certainly something we do recognize. But just - - just ordinary process of aging, some people don't hear as well as others, that's just a fact of life.

And we voir dire. Everybody gets a chance to be satisfied that a juror can - - can serve as a juror. And if not, you can ask the Court to excuse them for cause. But I don't think there's anything to be gained by questioning this woman about what she thinks she heard or what she thinks she didn't hear.

[Defense Counsel]: I understand, Your Honor. I would just make one last point, that juror number [one] was actually questioned by the State, do we need to speak up? Can you hear okay? And her response was, yes, I can hear you fine.

THE COURT: I'll be doing that. I'll be checking with the jury. There's nothing wrong with the Court during - - during the process of the trial to inquire and make sure the people can hear what's being said.

[Defense Counsel]: Yes, Your Honor.

THE COURT: That's the best the Court can figure out to do.

[Defense Counsel]: Your Honor, if we - - if your ruling is we cannot determine whether or not juror number [nine] has missed substantial portions of this trial due to her hearing, which she responds in voir dire she had no problem with, so there's no need to further voir dire her, I took

- 23 -

her at her word that she could hear fine. So there was no need to further voir dire her on that issue.

If the ruling is we cannot determine if she's missed substantial portions of this murder trial, I have to ask for a mistrial, Your Honor.

THE COURT: I understand.

[Defense Counsel]: That's my motion. I would - -

THE COURT: Does the State want to put anything on the record about that?

[Defense Counsel]: - - greatly appreciate a ruling on that. Thank you.

THE COURT: Certainly.

[The Prosecutor]: Yeah. I want to say again, at this point in time, we do not know what, if anything, the juror has heard, what she has not heard, if she has not heard anything. We don't know what it is that she said she's having trouble hearing. Maybe it's the lawyers. We don't know that there's any proof in the record at this point in time whether or not she has been unable to hear anything that the witnesses have said.

But, again, this is a situation where you've got to sit - - we just cannot bring the jury - - the juror in here and inquire of the juror what, if anything, she has heard. We just - - that - - I think that invades the province of the jury.

Defense counsel then requested to call Officer Miller to the witness stand in order to create a record concerning the issue. The trial court denied defense counsel's request and stated that it would not make any further inquiry into the matter. Defense counsel asked to have the juror stay after trial "if there's a verdict of guilt just so that we can inquire how much of the trial she missed." The trial court replied: "I'll think about that. We'll consider - - continue to think about it."

Initially, as argued by the State, we find that this issue is waived. Although the trial court denied the Defendant's request to question the juror during trial about whether she had missed any testimony, the trial court indicated that it would consider having the juror stay after trial for questioning about the matter. There is no evidence that the Defendant requested any further questioning of the juror after trial nor did the Defendant present any evidence concerning this issue at the hearing on the motion for new trial. Therefore, by

- 24 -

"fail[ing] to take whatever action was reasonably available to prevent or nullify the harmful effect" of the trial court's denial of the Defendant's request to question the juror during trial, the Defendant has waived this issue. Tenn. R. App. P. 36(a). Moreover, the Defendant has not demonstrated plain error because the trial court did not breach any clear and unequivocal rule of law. *See State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994); Tenn. R. App. P. 36(b).

In any event, "[t]he right to trial by jury is a fundamental right preserved by article I, § 6 of the Tennessee Constitution and has 'special resonance in criminal matters.'" *State v. Cleveland,* 959 S.W.2d 548, 551 (Tenn.1997) (quoting *Ricketts v. Carter,* 918 S.W.2d 419, 424 (Tenn.1996)). The right to a unanimous verdict is included in the right to trial by jury. *Cleveland,* 959 S.W.2d at 551. Additionally, it "includes the right to have every fact tried and determined by twelve jurors and to have all issues of fact submitted to the same jury at the same time." *Id.; see also State v. Bobo,* 814 S.W.2d 353, 356 (Tenn. 1991). According to Tennessee Code Annotated section 22-1-103(a) (2009):

> Any person may be excused from serving as a juror if the prospective juror has a mental or physical condition that causes that person to be incapable of performing jury service. The juror, or the juror's personal representative, must provide the court with documentation from a physician licensed to practice medicine, verifying that a mental or physical condition renders the person unfit for jury service.

"Unless there has been clear abuse, the trial court's discretion in determining the qualifications of jurors is not subject to review." *State v. Mickens*, 123 S.W.3d 355, 375 (Tenn. Crim. App. 2003) (citing *Lindsey v. State*, 225 S.W.2d 533, 538 (1949)).

In this case, there has been no clear abuse of discretion by the trial court in its response to juror number nine's complaint about not being able to hear. As pointed out by the State, the trial court was not required to inquire into how much testimony a juror may have missed at trial. *See State v. Mark Anthony Foulk*, No. E2007-00944-CCA-R3-CD, 2009 WL 47346, at *12 (Tenn. Crim. App., at Knoxville, Jan. 8, 2009) (Although the trial court did not ask the juror whether she had missed any testimony of the four witnesses who testified prior to her request for an amplifier, the juror's "statements on the subject indicate, at most that she had experienced some difficulty in hearing and wanted assistance"). The record contains no suggestion that juror number nine had any difficulty hearing the testimony after the trial court addressed the juror's complaint. *Id.; see also State v. Raymond G. McCarter*, No. E2004-01639-CCA-R3-CD, 2005 WL 1996633, at *4-5 (Tenn. Crim. App., at Knoxville, Aug. 18, 2005) (No showing in the record that the juror's hearing impairment made her incapable of performing her duties). Both the trial court and the State repeatedly ensured that the jury could hear both the testimony and questioning. In fact, the jurors notified the court officer later in the trial that they were having difficulty

hearing defense counsel. The court officer informed the trial court: "I had three of them say that they can't hear him. He needs to talk louder or talk into the mic." The trial court then directed the officer to remind defense counsel to talk louder. The Defendant is not entitled to relief on this issue.

### D. Improper Prosecutorial Argument

The Defendant argues that the prosecutor's closing rebuttal argument was an improper comment on the Defendant's refusal to testify and that the trial court erred by overruling the Defendant's objection to the argument. More specifically, the Defendant contends that the prosecutor improperly addressed the Defendant in front of the jury and stated that the Defendant was responsible for the victim's death. The prosecutor further said that the Defendant and his accomplice could have taken the victim's property without killing him because he was disabled. The State responds that the prosecutor's rebuttal argument was not improper and did nothing more than restate the evidence that had been presented to the jury.

Our supreme court has consistently opined on prosecutorial misconduct regarding closing arguments as follows:

> The basic purpose of closing argument is to clarify the issues that must be resolved in a case. *State v. Banks*, 271 S.W.3d 90, 130 (Tenn. 2008). While "argument of counsel is a valuable privilege that should not be unduly restricted," *Smith v. State*, 527 S.W.2d 737, 739 (Tenn. 1975), "such [ ] arguments must be temperate, based upon the evidence introduced at trial, relevant to the issues being tried, and not otherwise improper under the facts or law." *State v. Goltz*, 111 S.W.3d 1, 5 (Tenn. Crim. App. 2003); *Coker v. State*, 911 S.W.2d 357, 368 (Tenn. Crim. App. 1995); *see* also *State v. Middlebrooks*, 995 S.W.2d 550, 557 (Tenn. 1999). Because closing argument affords an opportunity to persuade the jury, 11 DAVID L. RAYBIN, TENNESSEE PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 29.2, at 97 (2008), leeway should be given regarding the style and substance of the argument. *Banks*, 271 S.W.3d at 131; *State v. Cauthern*, 967 S.W.2d 726, 737 (Tenn. 1998). Hence, counsel may employ "forceful language in their closing arguments, as long as they do not stray from the evidence and the reasonable inferences to be drawn from the evidence." *Banks*, 271 S.W.3d at 131.

*State v. Sexton*, 368 S.W.3d 371, 418-19 (Tenn. 2012).

As explained by our supreme court in *Sexton*, there are five general areas of potential prosecutorial misconduct related to closing argument:

(1) It is unprofessional conduct for the prosecutor intentionally to misstate the evidence or mislead the jury as to the inferences it may draw. (2) It is unprofessional conduct for the prosecutor to express his personal belief or opinion as to the truth or falsity of any testimony or evidence or guilt of the defendant. (3) The prosecutor should not use arguments calculated to inflame the passions or prejudices of the jury. (4) The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence, by injecting issues broader than the guilt or innocence of the accused under the controlling law, or by making predictions of the consequences of the jury's verdict. (5) It is unprofessional conduct for a prosecutor to intentionally refer to or argue facts outside the record unless the facts are matters of common public knowledge.

*Sexton*, 368 S.W.3d at 419 (citing *Goltz*, 111 S.W.3d at 6 (citations omitted)); *see also AMERICAN BAR ASSOCIATION, STANDARDS RELATING TO THE PROSECUTION FUNCTION AND THE DEFENSE FUNCTION* §§ 5.8-5.9 (1970).

Our supreme court has also advised that a criminal conviction should not be lightly overturned solely on the basis of the prosecutor's closing argument. *Banks*, 271 S.W.3d at 131 (citing *United States v. Young*, 470 U.S. 1, 11-13 (1985); *State v. Bane*, 57 S.W.3d 411, 425 (Tenn. 2001) (holding that a prosecutor's improper closing argument does not automatically warrant reversal)). "An improper closing argument will not constitute reversible error unless it is so inflammatory or improper that if affected the outcome of the trial to the defendant's prejudice." *Id.* (citing *State v. Thacker*, 164 S.W.3d 208, 244 (Tenn. 2005); *State v. Cribbs*, 967 S.W.2d 773, 786 (Tenn. 1998)); *see also State v. Reid*, 164 S.W.3d 286, 321 (Tenn. 2005).

The Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Similarly, article I, section 9 of the Tennessee Constitution provides that "in all criminal prosecutions, the accused . . . shall not be compelled to give evidence against himself." Tenn. Const. art. I, § 9. Both provisions guarantee criminal defendants the unfettered right to remain silent and not testify at trial. *Carter v. Kentucky*, 450 U.S. 288, 305 (1981). Both provisions further prevent the State from commenting on the accused's silence. *Griffin v. California*, 380 U.S. 609, 615 (1965); *Jackson*, 444 S.W.3d at 586. It is possible, however, for the State to describe the proof as uncontradicted or make other indirect references to the defendant's silence without infringing on the defendant's Fifth Amendment rights, so long as the defendant is not the only person who could offer the contradictory proof. *Jackson*, 444 S.W.3d at 586-87 (internal citation omitted).

This court reviews the propriety of prosecutorial comments regarding the right to remain silent under a *de novo* standard and applies the following two-prong test:

(1) whether the prosecutor's manifest intent was to comment on [the][d]efendant's right not to testify; or (2) whether the prosecutor's remark was of such a character that the jury would necessarily have taken it to be a comment on [the] [d]efendant's decision not to testify.

*Jackson*, 444 S.W.3d at 588.

At trial, the Defendant began shaking his head during the prosecutor's rebuttal closing argument, and the prosecutor said: "You can shake your head all you want." At that point, defense counsel objected and this colloquy took place:

[The Prosecutor]:        You, [the Defendant], you, sir, are responsible for pulling out that gun, pointing that gun at [the victim] - - and that's the sad thing, is that y'all could have taken the property without killing the man. He's disabled. He couldn't move. He was buckled in.

[Defense Counsel]:        Your Honor, I would object again. The Prosecutor is still addressing my client. The jury is that way.

[The Prosecutor]:        I'm arguing - - explaining to the jury. He's shaking his head.

[The Court]:        She can address. She cannot make the defendant do or say anything, but she can address him as a part of her argument.

[Defense Counsel]:        My objection for the record is improper prosecutorial misconduct.

[The Court]:        Very well.

[The Prosecutor]:        All you had to do was take his property. It's not like he was going to tell if you stole from him, all right, 'cause in order for him to tell, he'd have to tell on himself for being a dope dealer.

Didn't have to shoot him in the back. He was trying to get away, but he couldn't. He didn't have any animosity for [the Defendant]. You see that in the text messages. He didn't threaten to turn [the Defendant] in for [the Defendant] selling him some bad pills. He didn't threaten that. He just wanted it to be made right.

- 28 -

That's what we ask you to do, come back and tell [the Defendant], you, sir, are guilty of the felony murder of [the victim]. That you, sir, are guilty of the especially aggravated robbery of [the victim].

In denying the Defendant's motion for new trial on this issue, the trial court declined to find any error in the above statements and further found that "if it is legal error, then I'm ruling that it was harmless." The trial court told the prosecutor it was "not the best practice" to directly address a defendant who had chosen not to testify. The record reflects that the prosecutor turned and directly addressed the Defendant in this case.

We conclude that the prosecutor's statements during rebuttal closing argument were improper. The purpose of a closing argument is to address the jury and the prosecutor should not have addressed the Defendant directly, particularly because the Defendant had chosen not to testify. The prosecutor's comment was inappropriate, as was the Defendant himself shaking his head in front of the jury during the prosecutor's closing argument. However, we agree with the trial court that any error was harmless. The proof against the Defendant, which included surveillance video of the crimes, was overwhelming. Moreover, the trial court instructed the jury that "the statements, arguments and remarks of the attorneys are intended to help you in understanding and applying the law but they are not evidence. You should disregard any statements made that you believe are not supported by the evidence."

The trial court further instructed the jury:

The [D]efendant has not taken the stand to testify as a witness, you shall place no significance on this fact. The [D]efendant is presumed innocent and the burden is on the state to prove his guilt beyond a reasonable doubt. He is not required to take the stand in his own behalf, and his election not to do so cannot be considered for any purpose against him, nor can any inference be drawn from such fact.

It is presumed that the jury followed the trial court's instructions. *State v. Reid*, 164 S.W.3d 286, 323 (Tenn. 2005). The Defendant is not entitled to relief on this issue.

### E. Sufficiency of the Evidence

The Defendant contends that the evidence was insufficient to support his convictions for felony murder in counts one, two, five, and six and especially aggravated robbery in count seven because the "State failed to prove that anyone attempted to, or succeeded in, illegally taking property from [the victim]." He further argues that the evidence was insufficient to support his convictions for felony murder in counts three and

four because the evidence did not prove that he or anyone that he was criminally responsible for, entered the victim's vehicle without consent.  The State responds that the evidence, based upon a theory of criminal responsibility, established that the Defendant took the victim's property and entered his vehicle without consent.

When an accused challenges the sufficiency of the evidence, this court's standard of review is whether, after considering the evidence in the light most favorable to the State, "any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)).  This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence.  *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)).  In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973).  "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice*, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)).  "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this court should not re-weigh or reevaluate the evidence.  *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).  Nor may this court substitute its inferences for those drawn by the trier of fact from the evidence.  *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)).  "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact."  *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997).  "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973).  The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation.  The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand.  Thus[,] the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

"A person is criminally responsible as a party to an offense, if the offense is committed by the person's own conduct, by the conduct of another for which the person is criminally responsible, or by both." T.C.A. § 39-11-401(a)(2018). An individual is criminally responsible for the conduct of another person if, "[a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense[.]" *Id.* § 39-11-402(2). Under the theory of criminal responsibility, "an individual's presence and companionship with the perpetrator of a felony before and after the commission of an offense are circumstances from which his or her participation in the crime may be inferred." *State v. Watson*, 227 S.W.3d 622, 639 (Tenn. Crim. App. 2006) (citing *State v. Ball*, 973 S.W.2d 288, 293 (Tenn. Crim. App. 1998)). In this situation, "[n]o particular act need be shown, and the defendant need not have taken a physical part in the crime to be held criminally responsible." *Id.* (citing *Ball*, 973 S.W.2d at 293). To prove a defendant's guilt under the theory of criminal responsibility, the State must establish that the defendant "'knowingly, voluntarily and with common intent unite[d] with the principal offender[ ] in the commission of the crime.'" *State v. Maxey*, 898 S.W.2d 756, 757 (Tenn. Crim. App. 1994) (quoting *State v. Foster*, 755 S.W.2d 846, 848 (Tenn. Crim. App. 1988)). Criminal responsibility for the actions of another person "requires that a defendant act with a culpable mental state, specifically, the 'intent to promote or assist the commission of the offense or to benefit in the proceeds or results of the offense.'" *State v. Carson*, 950 S.W.2d 951, 954 (Tenn. 1997) (quoting T.C.A. § 39-11-402(2)). "A person acts with intent as to the nature or result of conduct when it is that person's conscious objective or desire to engage in the conduct or cause the result." *Id.* (citing T.C.A. § 39-11-302(a); *Maxey*, 898 S.W.2d at 757).

Felony murder is defined as "[a] killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse or aircraft piracy." T.C.A. § 39-13-202(a)(2). Robbery is defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." T.C.A. § 39-13-401(a). Especially aggravated robbery is robbery accomplished with a deadly weapon and where the victim suffers serious bodily injury. T.C.A. § 39-13-403(a). "A person commits burglary who, without

- 31 -

the effective consent of the property owner: . . . (4)[e]nters any . . . passenger car, automobile, or truck . . . with intent to commit a felony, theft or assault or commits or attempts to commit a felony, theft or assault." T.C.A. § 39-14-402(a)(4). A theft of property occurs when someone, with the intent to deprive the owner of property, knowingly obtains or exercises control over the property without the owner's effective consent. T.C.A. § 39-14-103(a). Criminal attempt is defined as occurring when a person "acting with the kind of culpability otherwise required for the offense" engages in "an act or acts in furtherance of the attempted crime." T.C.A. § 39-12-101.

In this case, the Defendant was charged with felony murder in perpetration of an attempted robbery in count one, felony murder in perpetration of a robbery in count two, felony murder in the perpetration of an attempted theft in count five, felony murder in the perpetration of a theft in count six, and especially aggravated robbery in count seven. The Defendant argues that the evidence as to those counts was insufficient to show that he attempted to or succeeded in taking the victim's property. However, viewed in the light most favorable to the State, the proof established that, under a theory of criminal responsibility, the Defendant took the victim's property. Text messages exchanged between the Defendant and the victim prior to the murder established that the victim intended to purchase pain pills from the Defendant with a purchase price of $4,140. The surveillance video from the Red Roof Inn clearly showed the Defendant's accomplice leave the victim's van with a white envelope in his hand after the Defendant fatally shot the victim. The police found $140 in the victim's pocket when they arrived on the scene and two white envelopes each containing $1,000 in $100 bills for a total of $2,140 in the victim's van. The keys to the victim's van were never found.

From this evidence, a jury could reasonably infer that the Defendant and his accomplice took the victim's keys and the remaining $2,000 of the purchase price of the drugs from the victim. *See State v. Michael Rimmer*, No. W2017-00504-CCA-R3-DD, 2019 WL 2208471, at *4 (Tenn. Crim. App., at Jackson, May 21, 2019) (evidence establishing that $600 and several sets of bed sheets missing from the crime scene, a motel office, was sufficient to support the defendant's convictions for felony murder and aggravated robbery), *aff'd*, 623 S.W.3d 235 (Apr. 16, 2021), *rehearing denied*, (May 21, 2021). The State presented sufficient evidence from which a jury could conclude that the Defendant committed the offenses of felony murder in counts one, two, five, and six and especially aggravated robbery in count seven. The Defendant is not entitled to relief on this issue.

The Defendant was charged with felony murder in the perpetration of an attempted burglary in count three and felony murder in the perpetration of a burglary in count four. The Defendant contends that the evidence as to those two counts was insufficient to show that he or anyone that he was criminally responsible for entered the victim's vehicle without the victim's consent. Viewed in a light most favorable to the State, the proof established that the Defendant's accomplice entered the victim's van after the Defendant

shot the victim multiple times and took a white envelope.  Although it appears that the Defendant and his accomplice had consent to initially enter the victim's van, a jury could infer that the Defendant's accomplice did not have consent to reenter the victim's van to take the envelope as the victim was dying after the Defendant shot him multiple times. Accordingly, we conclude that there was sufficient evidence to support the jury's finding, beyond a reasonable doubt, that the Defendant committed the offense of felony murder in counts three and four.  The Defendant is not entitled to relief as to this issue.

## II.      Conclusion

Based on the foregoing reasoning and authorities, we affirm the trial court's judgments.


_____
ROBERT W. WEDEMEYER, JUDGE